Filed 2/29/16  P. v. Haff CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C076319 |
| Plaintiff and Respondent, | (Super. Ct. No. 13F5044) |
| v. | |
| DERRICK MATTHEW HAFF, | |
| Defendant and Appellant. | |

As argued by the prosecution, and supported by the evidence, the brutal beating in this case began a cycle of violence and forgiveness often encountered in domestic violence cases, including a victim who recants, reunites with her abuser, and refuses to cooperate with the prosecution.  Despite the victim's minimization at trial of the damage to her jaw, head, teeth, tongue, and upper torso, a jury convicted defendant of corporal injury to a cohabitant (Pen. Code, § 273.5, subd. (a)) and mayhem (Pen. Code, § 203) and found he personally inflicted great bodily injury within the meaning of Penal Code section 12022.7, subdivision (e).  On appeal, defendant Derrick Matthew Haff urges us to reverse the jury verdict for insufficiency of the evidence, instructional and evidentiary error, and ineffective assistance of counsel.  We conclude his arguments are without merit and affirm the judgment.

1

# FACTS

Because the victim felt abused by the system but loved her abuser and openly admitted her desire to help him, the prosecution relied foremost on the testimony of those who saw and heard her in the aftermath of the beating she sustained on March 15, 2013. Her neighbor first observed her stumbling toward her with a rag on her head. She testified she had never seen anyone beaten that badly in her lifetime: the victim's eye was bulging out, she was covered in blood, she could not speak, her teeth were all "screwed up," and it looked like her jaw was broken. The victim told her, "[H]e beat me up," which the neighbor understood to be a reference to the victim's boyfriend, defendant. The prosecution played a recording of the 911 call the neighbor made wherein she explained that the victim's boyfriend beat up the victim, they had to get him arrested, and the victim's mouth was too swollen to talk. The neighbor did not mention an injury to the victim's tongue.

When the victim's mother arrived within a few minutes, she saw her daughter "[b]ruised, bloody. She was a mess. Totally -- totally beat up." Her face was swollen and she had bruises on her arms and legs. The victim told her mother that defendant had beaten her up, kicked her, and kicked her in the head. The mother also explained that her daughter suffers from a seizure disorder. She drove her daughter to the hospital.

A deputy sheriff contacted the victim in the emergency room. He observed a lot of swelling on the left side of her face, bruising all over her face, and bruises on her arms. The victim told him she had pain in her legs and ribs. He did not notice any injuries to her tongue, and he could understand what she was saying. He did not inspect the victim's house because she told him "she cleaned up the scene prior to going to the neighbor's house." About two weeks later, he showed the victim a picture of defendant and she confirmed that he had assaulted her. Defendant was arrested on May 30, 2013.

A victim advocate from a program that serves victims of domestic violence testified the victim had been referred to her program on March 20, 2013. She placed the

2

victim in a motel and provided support services to her. During her initial meeting, she noticed red bruising on the right side of the victim's face and around her neck. The following day, the victim had "raccoon eyes" that were black and blue under her eyes with more visible bruising on the right side of her face. She slurred her words and did not directly answer questions. By the 22d, her facial bruising was more black and blue, she had redness on her neck, the back of her neck and behind her ear was black and blue, she had trouble focusing, she had redness in the whites of her eyes, and she complained of pain in her jaw and the back of her neck. She had additional bruising on her upper left shoulder, the back of her left arm and around the whole arm, and she had a bad tooth. Eventually the victim advocate took the victim to the emergency room again.

The victim did not appear to testify as ordered. She was arrested and had spent the night in jail before she ultimately testified. She was angry with the district attorney and abrasive throughout her testimony. She told the trial judge, "I don't have any answers. They really want to talk. So, I might not answer." Shortly after she began to testify, she announced, "I'm done with this. I just want to go home, you guys." She admonished the prosecutor to "[g]et to the point." On many occasions she refused to answer the question, but she insisted, "I'm an honest fricking person for the most part unless I'm being a dick." She purportedly remembered little of what had happened on March 15, 2013. When asked to read her prior statement to refresh her recollection, she claimed she was dyslexic. The court concluded, "[S]he was intentionally evading the Prosecutor's questions on direct and feigning lack of knowledge."

Despite her obstreperous demeanor, the victim did admit to certain salient facts. She admitted that she and defendant had broken up on March 15, 2013, she went to the hospital that same day, and she had bruises on her body from the assault on that day. She admitted she told an investigator that she had blood in her eyes, her tongue looked different because she had 'bit a chunk off of it during the assault," her mouth had been bleeding a lot, and there was a puddle of blood because she was unconscious for a few

3

hours. She told the investigator her forearms were black from bruising as a result of trying to deflect kicks to her face with her forearms. She admitted she was in love with defendant and she did not want him to get in trouble.

During cross-examination, the victim described her seizure condition. When she convulses she shakes, loses consciousness, and falls. She often awakes violently and does not remember the convulsion. She insists she has memory loss associated with her condition. She testified she had "no real recollection" about the assault and she relies "on what other people had told me had happened." Nevertheless, she testified she remembers biting her tongue during her convulsions and needing stitches on one occasion. She testified she has scars from injuries caused by falling. She reported that during one convulsion sometime before February 2013 she fell on her face and broke a tooth.

The prosecution offered the testimony of an expert on behavior typical of victims of domestic violence. Often they recant or minimize their original accusations or refuse to testify due to fear of reprisal, to preserve a family relationship, for economic stability, or to preserve a relationship with an abuser they still love. This same expert met with the victim five months after the beating. The interview was recorded and excerpts played for the jury. Because the victim told him she had injured her tongue and the disfigurement was still visible, he went to her home to take a photograph. The victim also said she had broken a tooth and she thought the broken tooth had severed her tongue from her body. In explaining one of the photographs to the jury, the expert stated, "And the purpose of taking this photograph was she had pointed to the left side of her tongue as being where that portion had come off of, had been bitten off of. And that it was noticeably different from the more severed front section on the right where you can see it's more straight and somewhat of an indentation there on the left."

A prior victim of defendant's cruelty testified for the prosecution pursuant to section 1109 of the Evidence Code. She had lived with him for eight or nine years, during which time there were many incidents of reported and unreported abuse. She

4

testified she never reported the following injuries: a broken jaw, fractured ribs, a collapsed lung, broken tailbone, broken fingers, and a miscarriage. She described specific incidents of abuse that occurred on September 30, 2001, December 21, 2001, and January 20, 2005. In at least two of the incidents, defendant hit her in the face and chest area. The parties stipulated that defendant was convicted of corporal injury on a cohabitant for the December 21, 2001, incident.

Defendant appeals.

## DISCUSSION

### I. Sufficiency of the Evidence

Defendant challenges his conviction for simple mayhem. Penal Code section 203 defines simple mayhem as follows: "Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem."

While defendant conceded during closing argument he had inflicted corporal punishment on the victim, he insisted throughout the trial, and reiterates on appeal, that there is no substantial evidence he cut or disabled the victim's tongue. There is no doubt the evidence of mayhem is weak. As defendant aptly points out, none of the witnesses who saw her immediately after the beating testified she complained about her tongue. There are no medical records her tongue was cut or disabled. Indeed, the first mention of the injury to her tongue was not until five months after the beating. During a telephone interview with an investigator from the district attorney's office, the victim stated that at some point during the assault she "had bit a chunk outta [*sic*] my tongue," and after the assault "[t]here was a chunk of my tongue on the floor." As a result, she told the investigator, "[M]y tongue looks kinda [*sic*] weird." He drove to her apartment to take photographs of her tongue, and those photographs were shown to the jury.

5

Defendant reminds us of the routine principles guiding appellate review of the sufficiency of the evidence. We are not to look at snippets of the record but must review the evidence of mayhem in light of the entire record. (*People v. Johnson* (1980) 26 Cal.3d 557, 577.) Some evidence is not enough to sustain a judgment. (*Ibid*.) Rather, we must be able to point to evidence of solid value; that is, credible evidence that reasonably inspires confidence. (*People v. Rountree* (2013) 56 Cal.4th 823, 852-853.) In defendant's view, the victim's isolated and uncorroborated comment to an investigator five months after the beating does not constitute substantial evidence, particularly when the victim admitted lying to the investigator and no witness actually saw an injury to her tongue at the time of the beating. Moreover, at trial the victim testified that the assault did not cause her to bite off her tongue. In essence, defendant recycles on appeal the same argument the jury rejected at trial.

We have carefully reviewed the evidence of mayhem in the context of the entire record to determine whether it is sufficient to support the jury's determination. The question, of course, is not whether we would have reached a different assessment, but whether the evidence is sufficiently credible, reasonable, and of solid value to satisfy the substantial evidence test. Defendant did an excellent job at trial exposing the weaknesses in the victim's account to the investigator, including her motives for lying to him, her ongoing seizure condition, and the lack of permanent disfigurement. But on appeal he minimizes the evidence that supports the jury verdict and meets the threshold for affirming the judgment.

As mentioned, the victim told the investigator that during the assault she bit a portion of her tongue off and she saw a chunk of it on the floor. A single witness's testimony alone constitutes substantial evidence. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) In addition, the investigator followed up by taking a photograph of the victim's tongue, which apparently revealed an ongoing disfigurement. Even defendant's lawyer counseled the jury that not all tongues are symmetrical. It was the jury's

6

prerogative, not ours, to evaluate the victim's credibility and to determine if the photograph supported her description of the abnormality still present on her tongue.

Defendant ignores how closely the victim fits the profile of a repeat victim of domestic violence. In the context of the whole record, the jury could consider the expert's explanation that victims often recant, minimize the violence they previously reported, and seek to protect their perpetrators. It is true, as defendant argued to the jury, that the victim suffered from a seizure condition and she may have bitten her tongue during one of those episodes. But the jury was free to reject that inference and believe, as the prosecutor contended, that as a classic victim of abuse she was feigning forgetfulness or boldly lying. In short, the jury may have found that her description of biting off a chunk of her tongue during the assault was more credible than her later testimony denying that it happened. The jurors were well informed about the dearth of corroborating evidence to support the belated report of the damage to her tongue, and yet they found beyond a reasonable doubt that defendant had cut or disfigured her tongue. We reject his argument that there was no substantial evidence to support it.

We also reject defendant's contention that although he may have been punching and kicking her in the head, he is not guilty of mayhem if the victim bit off a piece of her own tongue. As support, he cites to a case in which the defendant personally bit the lip of his victim. (*People v. Caldwell* (1984) 153 Cal.App.3d 947, 950.) Because the facts in one mayhem case involve the direct maiming of the victim does not mean that causing a victim to maim herself by the direct use of force against her does not constitute mayhem. Indeed, as stated in *People v. Nunes* (1920) 47 Cal.App. 346, "If a person unlawfully strikes another, not with the specific intent to commit the crime of mayhem, and the blow so delivered results in the loss or disfigurement of a member of the body of the assaulted party or in putting out his eye, the crime is nevertheless mayhem." (*Id*. at p. 349.) Thus, defendant's assault on the victim, which resulted in the cutting or disfigurement of her tongue, can constitute mayhem. There is ample evidence defendant assaulted the victim,

7

and therefore there is substantial evidence that the assault caused her to bite off a chunk of her tongue. He was properly convicted of the crime of simple mayhem.

## II. Instructional Error

### A. *Great Bodily Injury*

Given its historical underpinnings in the 19th century, the law on mayhem is somewhat anachronistic and no longer exists as a crime in many of our sister states. (*People v. Santana* (2013) 56 Cal.4th 999, 1003-1004 (*Santana*).) Nevertheless, California retains its mayhem statutes, including Penal Code section 203 as quoted above. Despite the absence of "great bodily injury" within the text of the simple mayhem statute, defendant contends the trial court committed reversible error by failing to instruct sua sponte that great bodily injury is an element of mayhem. The evolution of the crime may suggest ambiguity, but defendant cites no case that requires a court to instruct on great bodily injury. To the contrary, the language of the statute and recent cases suggest just the opposite.

Some of the conduct proscribed by the statute is quite general, whereas other conduct is described with specific particularity. A person who "deprives a human being of a member of his body, or disables, disfigures, or renders it useless" commits mayhem. But the Legislature goes on to identify very specific injuries, and so a person who "cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip" is also guilty of mayhem. The Supreme Court is attuned to the distinction. In *Santana*, *supra*, 56 Cal.4th 999, the court explained: "[S]ection 203 includes among the injurious acts constituting mayhem, *cutting* or disabling the tongue and *slitting* the nose, ear or lip. Nothing suggests that these injuries must involve protracted loss or impairment of function, require extensive suturing, or amount to serious disfigurement. While these examples are merely illustrative and do not constitute serious bodily injuries as a matter of law [citation], they underscore how imprecise and ill fitting the definition is for the statutory offense of mayhem." (*Santana*, at p. 1010.)

8

Adopting the *Santana* rationale, the Court of Appeal in *People v. Robinson* (2014) 232 Cal.App.4th 69 also recognized that cutting or disabling the tongue, like slitting the nose, ear, or lip, does not require a separate finding of serious bodily injury. "[T]he California Supreme Court held that serious bodily injury is *not* an element of [Penal Code] section 203 and that CALCRIM No. 801, which included a requirement that the prosecution must prove that the defendant caused serious bodily injury, is erroneous. [Citation.] The court specifically noted that section 203 can be violated by cutting the tongue or slitting the nose, ear or lip, none of which are necessarily serious bodily injuries." (*Robinson*, at p. 74.)

The courts in these cases, therefore, recognize that the Legislature has defined a subset of injuries—injuries to parts of the face—that are inherently egregious and are tantamount to great bodily injury. In those cases, the jury need not make a separate finding on great bodily injury. A cut or disabling injury to the tongue is on the list of injuries delineated by the Legislature that qualify as great bodily injuries. As a result, the court did not have a sua sponte obligation to instruct that great bodily injury is an element of mayhem.

Moreover, any instructional error would have been harmless beyond a reasonable doubt. The jurors certainly could have rejected the victim's testimony that she bit her tongue during the assault and saw a chunk of it on the floor, but they did not. Thus, the record does not support an inference that the victim suffered a minor cut or an insignificant disabling injury. In finding mayhem based on a severed piece of tongue, the jury would have found the injury constituted great bodily injury beyond a reasonable doubt.

## B.     *Lesser Included Offenses*

Defendant argues the mayhem conviction should also be reversed because the trial court failed to instruct sua sponte on the lesser included offenses of assault and battery. The Attorney General does not dispute the general proposition that a trial court is obliged

to instruct on any lesser included offenses supported by the evidence (*People v. Smith* (2013) 57 Cal.4th 232, 239), nor does she dispute that assault and battery are lesser included offenses of mayhem (*People v. De Angelis* (1979) 97 Cal.App.3d 837, 841). The question is whether there is substantial evidence from which reasonable jurors can conclude that the lesser offense, but not the greater, was committed. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.)

Defendant again emphasizes how weak the evidence is that he caused the victim to bite off a portion of her tongue. He reminds us yet again that no one observed the abnormality near the time of the beating and no medical evidence corroborates the victim's account, given five months later. In his view, a reasonable juror who had been properly instructed on simple assault and battery might have discounted the victim's testimony and found defendant guilty of the lesser crimes. His argument suffers from a fundamental flaw—he is utilizing different evidence to support the lesser crimes than the evidence used to support the mayhem conviction.

The prosecution's theory was that defendant caused the victim to bite off part of her tongue while beating and kicking her in the face. Based on the victim's account to the investigator that was introduced as evidence at trial, either the jury believed her account and defendant is guilty of mayhem or it rejected her belated story. But if the victim did in fact sever her tongue, as the jury found, defendant's conduct amounted to mayhem, not assault and battery. The evidence of beating and kicking supported the conviction for the corporal injury to a cohabitant, but it was the injury to the tongue that rendered the crime mayhem. Given the pivotal evidence that a tongue was severed, there was no substantial evidence warranting an instruction on assault and battery. In other words, there was no substantial evidence that if the victim bit off a chunk of her tongue defendant was guilty of the lesser included offenses of assault or battery, and the trial court did not err by not instructing on the lesser included offenses.

## C.     *No Obligation to Prove Crime was Committed on the Charged Date*

The information charged that defendant committed corporal injury on a cohabitant causing great bodily injury and mayhem on March 15, 2013.  At least two of the witnesses, the victim and her neighbor, could not remember precisely when the beating occurred.  The defense did not rely on an alibi or lack of opportunity; in fact, the defense conceded defendant inflicted corporal injury on the victim on March 15, 2013.  The trial court instructed the jury, in the language of CALCRIM No. 207, as follows:  "It is alleged that the crime occurred on or about March 15, 2013.  The People are not required to prove that the crime took place exactly on that day but only that it happened reasonably close to that day."

Defendant argues that the instruction undermined his defense to the mayhem charges and the allegation he inflicted great bodily injury upon the victim and denied him due process.  He acknowledges he inflicted a corporal injury on the victim on March 15, but he disputes the nature and severity of the injury.  He insists that the victim may have bitten her tongue during one of her seizure episodes and not as a result of the corporal injury he inflicted on March 15.  By allowing the prosecutor to prove that the crime took place reasonably close to March 15, he concludes the jury may have convicted him of a mayhem he did not commit and found he inflicted great bodily injury when he did not.  We disagree.

Ordinarily, the prosecution need not plead or prove the exact time of commission of an alleged crime.  (*People v. Barney* (1983) 143 Cal.App.3d 490, 497.)  A limited exception applies, however, when the defendant urges an alibi defense and the exact time of the commission of the crime becomes critically essential to establishing an alibi.  Here the defense was not predicated on an alibi or lack of opportunity.  As a consequence, the "on or about" instruction did not "deflect the jury's attention from a crucial temporal element for which the defendant had an alibi."  (*People v. Richardson* (2008) 43 Cal.4th 959, 1028.)  We agree with the Attorney General that nothing in the challenged

11

instruction impeded defendant from presenting evidence that the victim sustained her injuries during a different assault or as a result of a fall during a seizure.

### III. Propensity Evidence

Evidence Code section 1109 allows evidence of prior acts of domestic violence to be admitted to show a defendant's propensity to commit such acts. (Evid. Code, § 1109, subd. (a)(1).) A trial court's admission of evidence of prior acts of domestic violence will not be disturbed on appeal absent an abuse of discretion. (*People v. Poplar* (1999) 70 Cal.App.4th 1129, 1138.) Defendant contends the trial court abused its discretion by indiscriminately allowing evidence of multiple acts of domestic violence against one of his former partners that were dissimilar to the manner in which he pummeled the victim in this case. He asserts that because admission of the prior episodes was far more prejudicial than probative, the trial court's abuse of discretion amounted to a denial of due process. We can find no abuse of discretion and no denial of due process.

The admissibility of the propensity evidence challenged on appeal was thoroughly litigated during in limine proceedings before trial. The trial court provided a reasoned analysis of the probative value of the evidence and carefully weighed the probative value against the inflammatory nature of the prior acts of domestic violence. The court explained: "As to the incidents involving Laura Lucero in 2001, 2003 and 2005, the thing that strikes me about that, and the reason I am going to allow the People to introduce that evidence under [Evidence Code section] 1109, is that based on the information that has been provided to me in the prosecutor's trial brief, it appears that the defendant[']s habit in these situations of domestic violence is to strike a female victim with whom he has a relationship in the face and chest area multiple times. They appear to be driven to a certain extent by jealousy.

"In this relationship with the female the force used is extreme force and the focus seems to be on the victim's head, which is -- or Ms. Lucero's head in this particular situation -- which seems to be nearly identical to what the prosecutor has indicated is the

12

state of the evidence or what they believe the evidence will show in this particular case. So it shows to me that the defendant has a pattern of using physical violence against the person that he's having a relationship with -- dating or otherwise -- and that demonstrates a course of conduct, a predisposition to commit these offenses to get what he wants out of the situation or to punish the other party for whatever he feels he's been wronged or something of that nature.

"So the acts are very similar so the probative value is very high and it substantially outweighs any risk of prejudice in evaluating under Evidence Code [section] 352. I think it's highly relevant to the jury to understand that this is the way that the defendant has acted in the past and for the People to argue that what occurred with the victim in this particular case is consistent with the past behavior of the defendant.

"So for those reasons primarily I'm going to allow the evidence in. Also, the time frame of these incidences is not too remote, considering the fact that the defendant has been in and out of custody either for committing new offenses or for parole violations, so he hasn't remained free from custody for a significant period of time, which also mitigates the issue of it being too remote in time and prejudicing the defendant. So all the requested incidents -- if I didn't state them all -- involving Ms. Lucero, I would admit her testimony under [Evidence Code section] 1109."

As a result of the trial court's ruling, Lucero testified to a number of incidents of domestic violence that occurred during the eight or nine years she lived with defendant. She testified defendant hit her on at least 10 occasions. She described several of the incidents in graphic detail. The shortened version of defendant's acts of domestic violence in 2001 and 2005 follows.

On September 30, 2001, Lucero criticized defendant over a minor transgression. Enraged, he tore off the front of her shirt and proceeded to hit her in the face and chest area. A couple of months later during an argument about defendant's using Lucero's car, he threw her on the bed, hit her with a lamp, slapped her, and punched her in the face.

13

The parties stipulated that defendant was convicted of felony corporal injury on a cohabitant (Pen. Code, § 273.5) for the December 21 incident. In January of 2005 Lucero's makeup triggered another violent response from defendant. Angry because he believed she was wearing too much makeup, defendant blew out the pilot lights, turned on all the gas appliances, and attempted to blow up the house.

Lucero also described injuries she never reported to the police. As a result of many other acts of domestic violence, she testified, she suffered a broken jaw, fractured ribs, a collapsed lung, a broken tailbone, broken fingers, and a spontaneous miscarriage.

On appeal, defendant dissects each incident to demonstrate how dissimilar the violence against Lucero was from the violence he perpetrated against the victim in this case, and how the trial court should have sanitized the evidence to render it less inflammatory. For example, he finds nothing similar about picking up Lucero and throwing her to the ground, causing a miscarriage and a broken tailbone, and beating the victim here in the face and chest. And he suggests the court should not have allowed testimony of the miscarriage, along with many of the other injuries including a broken jaw, because those injuries were far more inflammatory than the injuries the victim here suffered to her face, tongue, and upper body. His argument is utterly without merit.

The trial court carefully evaluated the probative value of the evidence and concluded that in each instance defendant flew into a violent rage over minor irritations with a domestic partner. Many times, he took advantage of the women's vulnerability and exerted terrible force to their faces, heads, and chests. We cannot say the court's assessment of the similarity of defendant's acts of domestic violence constituted an abuse of discretion. To the contrary, we agree with the court that defendant's pattern of abuse, which included exceedingly violent beatings of a woman, targeting primarily her head, face, and chest, was evident in his abuse of Lucero and the violence he inflicted on the victim in this case. Nor do we accept defendant's premise that the prior acts must be nearly identical to the present charges. Defendant's abuse of these women had sufficient

14

common denominators from which the jury could infer that a man who was easily provoked by a domestic partner over minor annoyances, to the point of forcefully striking her in the face and chest, was likely to resort to the same type of violent outburst whenever a female cohabitant irritated him.

Defendant objects most vociferously to the admission of evidence that he tried to blow up Lucero's house, an act he insists bears no resemblance to hitting and kicking this victim in the face. We find no abuse of discretion in allowing his prior partner to describe yet another incident demonstrating the degree of rage defendant displays in his ongoing violent rampages against his domestic partners. The prosecution was not limited to propensity evidence that involved only injuries to a woman's face.

We also reject the notion that the court erred by failing to sanitize the prior conduct to render it less incendiary. Defendant minimizes his own violent behavior by focusing exclusively on the injury the victim sustained to her tongue. But he ignores the testimony of every witness who observed her in the hours and days following the beating. Her neighbor expressed surprise she even survived such a brutal attack. Her neighbor, mother, and domestic violence victim advocate described how disoriented she was, how badly her face was swollen and bruised, and how much difficulty she had talking and walking. We therefore disagree with defendant's assertion that Lucero's testimony was far more inflammatory than the evidence of how defendant had beaten the victim and the numerous injuries she suffered. Actually, defendant's abuse of Lucero was no more likely to incite the jury's passions than the equally outrageous beating and kicking he inflicted on the victim here.

In sum, the trial court carefully considered the probative value of the propensity evidence as allowed by Evidence Code section 1109 and weighed the probative value against the risk of prejudice as dictated by Evidence Code section 352. The court's decision to admit evidence of defendant's prior acts of domestic violence against Lucero was well within its discretion. We can find no abuse of discretion.

15

## IV.  Ineffective Assistance of Counsel

Defendant recasts each of the issues discussed above as an ineffective assistance of counsel claim.  He bears the burden of proving counsel's performance was constitutionally deficient and that he suffered prejudice as a result of the incompetent representation.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 691-692 [80 L.Ed.2d 674].)  Because we have rejected each and every one of his claims, defendant cannot show that defense counsel's performance was constitutionally deficient. He had no obligation to raise futile objections to jury instructions, and he could have had tactical reasons for foregoing objections to those that would have made no difference. Moreover, because all of the asserted errors on appeal are without merit, he suffered no prejudice from the defense his lawyer provided.

## DISPOSITION

The judgment is affirmed.


                                                                    RAYE          , P. J.



We concur:



      NICHOLSON      , J.



      MAURO          , J.